### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FELIX KARTTE,<br><br>    Schandauer Str. 4a<br>    12045 Berlin<br>    Germany<br><br>          *Plaintiff*,<br><br>   v.<br><br>TREVOR HUGH DAVIS,<br><br>COUNTERACTION, LLC,<br><br>& TOSOMEONE, INC.<br><br>    512 Constitution Ave., NE<br>    Washington, D.C. 20002<br><br>        *Defendants*. | Civil Action No. 21-3310 (JEB) |

### SECOND AMENDED COMPLAINT

1.     Plaintiff, Felix Kartte ("Plaintiff" or "Kartte"), by and through his attorneys, the Law Offices of Peter C. Hansen, LLC, brings this action against Defendants, Trevor Hugh Davis ("Defendant" or "Davis"), CounterAction, LLC, and ToSomeone, Inc. (and any of the foregoing parties' corporate proxies or successors, with all collectively called "Defendants"), alleging with personal knowledge, unless whereupon information and belief is stated, the following:

### PARTIES

2.     Plaintiff, Felix Kartte, resides in Berlin, Germany.

3.     Defendant, Trevor Hugh Davis, resides, and owns and operates—or owned and operated during the relevant period—the Defendant businesses, CounterAction, LLC, and ToSomeone, Inc., in the District of Columbia.

4.      All actions alleged against Defendant Davis are separately alleged against the other Defendants since Defendant Davis acted as their chief executive and reasonably appeared to third parties to speak for them. Any reference to Defendant Davis (whether or not simply as "Defendant") also separately refers to the other Defendants.

## JURISDICTION AND VENUE

5.      This court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, as the action involves interests having a value in excess of $75,000, exclusive of interest and costs, and Plaintiff and Defendant are diverse from each other.

6.      This court also has original jurisdiction over Plaintiff's claims under 42 U.S.C. § 1981.

7.      This court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

8.      As the District of Columbia is the district where Defendant Davis resides, venue is proper within this district pursuant to 28 U.S.C. § 1391.

9.      As the District of Columbia is the district where the Defendant businesses are (or were) incorporated, and where they have their principal place of business, venue is proper within this district under 28 U.S.C. § 1391.

10.     This Court has personal jurisdiction over Defendants because Defendants conduct business operations within this district and have sufficient minimum contacts and have otherwise intentionally availed themselves of the market of this jurisdiction so as to render the Court's exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

## JURY DEMAND

11.     Plaintiff hereby demands a trial by jury in this action.

**FACTS**

12.     Prior to May of 2020, Plaintiff was a respected, highly-compensated business professional who was a policy expert and decision-maker working for the European External Action Service ("EEAS").

13.     Defendant owns and operates businesses named CounterAction, LLC, and ToSomeone, Inc., which are located in Washington, D.C., and which provide consulting and other services with regard to, among other things, digital intelligence including threat assessments, risk management, and information operations.

14.     In or about May 2020, Plaintiff contacted Defendant regarding Plaintiff's interest in beginning a new job.

15.     Defendant replied that Defendant wanted Plaintiff to come to work for Defendant, and Defendant began a series of communications, negotiations, and interviews with Plaintiff that led to Plaintiff ultimately contracting employment with Defendant in or about the beginning of September 2020.

16.     Under the terms of this contractual employment relationship, Defendant hired Plaintiff for the position of "Director of European Operation" of CounterAction, which Defendant characterized as a full-time, salaried senior-management-level position.

17.     During the hiring process, Defendant promised Plaintiff a hiring bonus as well as a consistently paid salary totaling $130,000.00 annually as foundational terms of his employment agreement with Plaintiff.

18.     Defendant also promised Plaintiff equity in the company, beginning three (3) months after Plaintiff's employment commenced.

19.     Although Defendant's company is based in Washington, D.C., Defendant falsely and intentionally conveyed to Plaintiff that he, Defendant, planned to open a subsidiary company in Berlin, Germany, specifically to accommodate Plaintiff's employment.

20.     Defendant's and Plaintiff's employment contract included Defendant's promise that this new company would be incorporated prior to Plaintiff's start date, in or about the end of August of 2020.

21.     When the new company was not incorporated by then, in breach of Plaintiff's employment contract with Defendant, Plaintiff, at Defendant's request, put Defendant in touch with a German lawyer, Mr. Timo Unrath, to assist with establishing the German corporation so that Defendant's company would be able to operate properly in Europe.

22.     At this time, Defendant and Plaintiff's colleagues already knew Mr. Unrath was a friend of Plaintiff.

23.     Upon information and belief, immediately after Plaintiff's employment with Defendants began, Defendant started treating Plaintiff with extreme abusiveness and hostility on a regular, ongoing, and continuous basis, including by making false, demeaning, disparaging and derogatory comments to and about Plaintiff; and Defendant intended his actions to demean and embarrass Plaintiff.

24.     In one example, Plaintiff set up meetings early on with high profile German journalists to increase exposure for Defendant's company, but Defendant failed to appear at these meetings. When asked by Plaintiff why Defendant failed to appear, Defendant responded that he (Plaintiff) should go "f--k" himself.

25.     This was only the beginning of Defendant's increasingly aggressive, hostile, and abusive pattern of behavior towards Plaintiff in the three (3) months of his employment with Defendant's company.

26.     During this time, Defendant also treated a close friend and colleague of Plaintiff, Ms. Monika Richter, in a thoroughly abusive manner.

27.     Moreover, Defendant at times failed to timely compensate Plaintiff for services rendered under their employment agreement until Plaintiff sent Defendant formal invoices, to the point that Plaintiff could at times not afford to pay his rent and health insurance.

28.     In or about the beginning of November 2020, Plaintiff began to receive text messages and emails from Defendant referring to Plaintiff as a "dishonest evil bastard," a "sociopath," and a "parasite." Defendant repeatedly threatened to "fire" Plaintiff for no evident reason, other than Plaintiff's refusal to speak on the phone with Defendant outside work hours, when Defendant was in a state of rage and outright hostility, or when Plaintiff refused to collaborate with Defendant in challenging claims made against Defendant by Ms. Richter.

29.     On November 26, 2020, Defendant terminated Plaintiff's employment, stating, "You are fired, you dishonest evil bastard."

30.     Without justification, Defendant claimed that Defendant had dismissed Plaintiff "with cause," both in direct messages to Plaintiff and publicly on Twitter.

31.     Defendant made this claim despite having told Plaintiff just days before that Defendant wanted him to be "more than just an employee."

32.     In fact, on November 20, 2020, Defendant had sent a formal email to Plaintiff praising the "phenomenal work" he had been doing, while adding, "You have the character and clarity of purpose to be a leader in a start-up."

33.    Similarly, on November 23, 2020, Defendant wrote to Plaintiff: "I am your employer … I don't want you as an employee, I want you as a partner."

34.    Defendant's ongoing threats and verbal abuse, and communications sent to Plaintiff and others in Plaintiff's business and professional community, have caused, and continue to cause, Plaintiff extreme emotional distress.

35.    Defendant even threatened Plaintiff to disclose his mother's address to the police, and to ensure that a private investigator or law enforcement agencies such as Interpol or the FBI would show up at Plaintiff's home or the home of Plaintiff's mother.

36.    Moreover, after Defendant fired Plaintiff on November 26, 2020, Defendant began to threaten Plaintiff, stating that if Plaintiff did not sign a non-disparagement agreement, Defendant would contact his former and future business contacts and provide them with (allegedly) derogatory information about Plaintiff. These contacts included, but were not limited to, the following individuals: Mr. Lutz Güllner, Mr. Tobias Schmid, and Ms. Anneli Ahone.

37.    This quickly became more than a mere threat since, upon information and belief, Defendant has indeed contacted and communicated with numerous individuals with whom Plaintiff has had professional connections, and Defendant has conveyed false and misleading information to them about Plaintiff, both in direct emails and text messages, and publicly via Twitter.

38.    For example, in or about December 2, 2020, Defendant wrote, "Felix stole our intellectual property and now he is extorting me." Defendant sent this message to Mr. Güllner, a business contact of Plaintiff.

39.    Furthermore, Defendant disclosed Plaintiff's sexual orientation (homosexual) to numerous, important business contacts. These contacts included, but were not limited to Mr.

Güllner, Mr. Ben Scott, and Mr. Jorg Diehl. Defendant disseminated this information in an effort to humiliate and embarrass Plaintiff in the eyes of key business contacts of Plaintiff, thereby interfering with Plaintiff's business relationships.

40.     For example, on or about December 2, 2020, after Mr. Unrath sent an email to Defendant on Plaintiff's behalf, Defendant forwarded that email to Mr. Scott, a potential business partner of Plaintiff, claiming: "I received this letter from an attorney I had engaged, who happens to be an intimate friend of Felix. I want you to see this so you know exactly what you are getting into when you work with him."

41.     In similar emails sent to Mr. Güllner, Mr. Scott, Daniel Braun, Mr. Diehl, and others, Defendant referred to Mr. Unrath as Plaintiff's "former lover" or "ex-boyfriend," and has suggestively accused Plaintiff of "hiding his friendship with Mr. Unrath."

42.     Defendant has thereby seriously diminished, and in some cases destroyed, any future business relationships that Plaintiff could have had with these individuals and the organizations they represent, and Plaintiff's ability to conduct business with them.

43.     Defendant's disclosure of Plaintiff's sexual orientation to third parties shortly after Defendant fired Plaintiff, and during a time in which Defendant was engaging in a pattern of hostile, outrageous conduct against Plaintiff, demonstrates that Defendant's communications and actions were motivated by discriminatory animus based on Plaintiff's sexual orientation.

44.     Furthermore, during this time, Defendant contacted German journalists seeking to have them write a story about Plaintiff's alleged attempts to extort him, allegations which Defendant knew were completely false. Defendant contacted Mr. Diehl and Bastian Obermayer, two well-known journalists, falsely told them that Plaintiff had extorted him, and falsely accused Plaintiff of having shared confidential information from his previous job with Defendant.

45.    Upon information and belief, Defendant's communications directed at Plaintiff, as described above, were disseminated knowingly and intentionally.

46.    Not only had Defendant previously threatened Plaintiff and Mr. Unrath explicitly with destroying their careers if Plaintiff did not comply with Defendant's demands, Defendant also falsely accused Plaintiff of criminal and unethical conduct in numerous defamatory messages.

47.    Defendant baselessly called Plaintiff's professional and personal integrity into question, seeking to damage his reputation and ability to conduct business, and actively advised his business contacts against working with Plaintiff.

48.    For instance, in an email to Mr. Braun, an important professional contact of Plaintiff with whom Plaintiff previously had worked closely at the EEAS, Defendant wrote: Plaintiff is a "person with negligible ethics and so you can consider this when taking any engagement with him whatsoever."

49.    Besides Mr. Braun and Mr. Scott, the other individuals Defendant contacted with defamatory statements about Plaintiff included Mr. Güllner, Mr. Schmid, and Ms. Ahonen, all of whom were business contacts and acquaintances of Plaintiff.

50.    Specifically, Defendant, in emails and public tweets dated December 2, 2020 and December 7, 2020, falsely accused Plaintiff of criminal "extortion" and fraudulent behavior. This is not only false, but *per se* defamatory.

51.    Furthermore, Defendant has publicly accused Plaintiff of criminal behavior on Twitter, for instance when Defendant tweeted from Defendant's company's public Twitter account: "Regretfully, Felix Kartte was dismissed last week. Rather than exiting with dignity, he has attempted to extort us, threatening to publish stolen data that would impact the personal security of our clients. We wish to reassure our clients that we have referred this to criminal

authorities and have taken steps to ensure the safety and security of our partnerships," and "if anyone knows of Felix Kartte's whereabouts, please let us or the nearest US consulate know."

52.     Upon information and belief, Defendant's communications described above are transparent efforts to destroy Plaintiff's reputation and libel him publicly.

53.     These efforts were further highlighted by emails in which Defendant made the same defamatory claims and false accusations about Plaintiff to several high-profile journalists, explicitly encouraging them to publish news stories about Plaintiff's alleged criminal conduct.

54.     Among the journalists whom Defendant contacted in the aforementioned manner were Mr. Diehl, Mr. Obermayer and Florian Eder.

55.     On January 3, 2021, Defendant contacted Plaintiff directly, denigrating and threatening him.

56.     In the January 3, 2021 contact, Defendant called Plaintiff "a coward" and ominously threatened Plaintiff that he (Defendant), "would be waiting in the tall grass for the rest of [Plaintiff's] life."

57.     Defendant also informed Plaintiff that Defendant had again complained to Interpol.

58.     Defendant also made derogatory references to Plaintiff's sexual orientation, for instance, by writing: "sleep tight, sugarplum"; "please don't cry, it will break my heart"; and "my dear sweet boy."

59.     Furthermore, since January 2021, Defendant has been directly contacting Plaintiff with threats and harassment, despite Plaintiff being represented by an attorney.

60.     Plaintiff, through his counsel, has sent Defendant multiple demands to cease the extreme, unrelenting harassing behavior, which is injurious to Plaintiff's emotional state of mind as well as to his professional and business career. However, Defendant has refused to comply.

61.     Starting near the end of November 2020, and continuing at least through the filing of the instant action, Defendant has sent threatening messages to Plaintiff on a continuous and ongoing basis via text, email and social media, and has repeatedly threatened to continue ruining Plaintiff's good name and reputation.

62.     For example, on February 10, 2021, Defendant wrote to Plaintiff: "I sent out 20 emails containing unedited versions of our correspondence. Look up the one party consent law in DC. It means I can record you without telling you. enjoy the show you unethical parasite." He also wrote: "And you can eat that shit sandwich. In public."

63.     Likewise, on June 10, 2021, Defendant wrote to Plaintiff: "i'm not going anywhere. i still get your emails. Shit, I have the IMETZ-43Z radio beacon on your device. you aren't hidden."

64.     Defendant has also continued to send defamatory and ethnically insulting communications about Plaintiff to Plaintiff's business contacts and acquaintances.

65.     For example, in a text dated February 22, 2021 to Ms. Richter, a business associate of Plaintiff, and possibly to others as well, Defendant called Plaintiff's family "Nazis" and separately threatened to physically harm him.

66.     Defendant's disparagement of Plaintiff's German nationality and his German ancestry and ethnicity to third parties shortly after Defendant fired Plaintiff, and during a time in which Defendant was engaging in a pattern of hostile, outrageous conduct against Plaintiff, demonstrates that Defendant's communications and actions were motivated by discriminatory animus based on Plaintiff's national origin and race.

67.     As a result of Defendant's continuing and ongoing, threatening, abusive behavior, Plaintiff has suffered extreme emotional distress, and substantial damage to his professional and personal reputation.

68.     By Order of the Chief Judge of the Superior Court of the District of Columbia dated November 21, 2021, all deadlines and time limits in statutes, court rules, and standing and other orders issued by the Court, including statutes of limitations, remain suspended, tolled, and extended during the period of the current judicial emergency due to the ongoing COVID-19 pandemic.

69.     On November 23, 2021, Plaintiff and Defendants executed a Tolling Agreement stipulating that the running of any and all applicable statutes of limitations were tolled through the earlier of the Tolling Expiration Date (December 22, 2021) or seven (7) days after receipt by one (1) party of a written notice of termination of the Tolling Agreement from the other party.

70.     On December 10, 2021, Defendant sent Plaintiff a written notice of termination of the Tolling Agreement dated November 23, 2021.

## FIRST CAUSE OF ACTION
### Defamation

71.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

72.     Plaintiff was the subject of Defendant's Twitter posts, conversations, text messages, and emails directed to or involving third parties, including recipients with whom Plaintiff was maintaining business relationships.

73.     Defendant's conveying of this information was deliberate and purposeful, and Plaintiff suffered, and continues to suffer, harm as a result of the information that Defendant communicated to others.

74.     Defendant's representations or statements to third parties, including those posted publicly on Twitter, alleging criminal and unethical conduct by Plaintiff, constitute false representations or statements.

75.     These representations or statements were knowingly false.

76.     At all times relevant to matters raised in this Complaint, Defendant knew that Plaintiff did not perform any of the unethical or criminal conduct described by Defendant.

77.     Despite Defendant's knowledge of the foregoing falsity, Defendant nonetheless communicated, emailed, tweeted, and texted this false information to third parties.

78.     Defendant's above-described, knowingly false representations and statements about Plaintiff constituted defamation *per se*.

79.     Defendant's above-described knowingly false representations and statements about Plaintiff were made with actual malice.

80.     Defendant's representations and statements falsely impute to Plaintiff a matter, practice, or course of conduct incompatible with his business, trade or profession.

81.     Such false and defamatory representations and statements about Plaintiff were conveyed to numerous current and prospective employers and journalists, including but not limited to Mr. Scott, Mr. Braun, Mr. Güllner, Mr. Schmid, Ms. Ahonen, Mr. Diehl, Mr. Obermeyer, Mr. Eder, and followers of Defendant's company's Twitter account.

82.     Defendant knew that his conduct described herein was wrongful and false.

83.    Defendant intended to deprive Plaintiff of a property interest or, at a minimum, evinced a conscious disregard for the fact that Plaintiff did not consent to Defendant's dissemination of false, defamatory information about Plaintiff.

84.    Defendant acted with actual or constructive knowledge of the high probability that injury or damage would result to Plaintiff.

85.    Defendant's defamatory Twitter posts, statements, texts, and emails about Plaintiff have directly and proximately harmed Plaintiff's professional reputation, among other injuries, which include lost economic and pecuniary value flowing directly from the injury caused by Defendant's defamation.

86.    Defendant's false communications to others including, but not limited to, Mr. Scott, Mr. Braun, Mr. Güllner, Mr. Schmid, Ms. Ahonen, Mr. Diehl, Mr. Obermeyer, Mr. Eder, and followers of Defendant's company's Twitter account, have tended to injure Plaintiff in his trade, business, and profession.

87.    For the above reasons, these false communications by Defendant constitute defamation *per se*.

88.    Defendant's defamatory statements concerning Plaintiff have damaged him in an amount to be determined at trial.

89.    As a result of Defendant's conduct, Plaintiff has suffered, and will continue to suffer, loss of income, mental anguish, emotional distress, and loss of enjoyment of life.

90.    As a result of Defendant's extreme, malicious conduct, Plaintiff is also entitled to punitive damages.

## SECOND CAUSE OF ACTION

**Employment Discrimination Based on Sexual Orientation in Violation of the D.C. Human Rights Act, D.C. Code § 2–1402.11 *et seq.***

91.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

92.    Plaintiff was an employee of Defendants within the meaning of D.C. Code § 2-1401.02(9).

93.    Defendants are employers within the meaning of D.C. Code § 2-1401.02(10).

94.    Discrimination because of an employee's sexual orientation is unlawful under the D.C. Human Rights Act. *See* D.C. Code § 2–1402.11 *et seq.*

95.    Plaintiff is a member of a protected class based on his sexual orientation (homosexual).

96.    Defendants were aware of Plaintiff's sexual orientation during the relevant time.

97.    While Plaintiff was employed by Defendants, Defendant's communications and actions against Plaintiff were abusive, intimidating, offensive, and humiliating, and they negatively impacted Plaintiff's terms, conditions, and privileges of employment, culminating in Defendant's unlawful termination of Plaintiff's employment in late November 2020.

98.    Shortly after Defendant terminated Plaintiff, Defendant disclosed Plaintiff's sexual orientation to numerous, important business contacts of Plaintiff, including but not limited to Mr. Güllner, Mr. Scott, and Mr. Diehl.

99.    Defendant also disparaged Plaintiff for his sexual orientation to Plaintiff and to third parties.

100.    Defendant's statements evidence that his abusive communications and actions against Plaintiff were motivated by discriminatory animus based on Plaintiff's sexual orientation.

101.    Plaintiff was subjected by the above-described actions to unwelcome harassment and disparate treatment based on his sexual orientation, treatment that was inferior to his colleagues who were not homosexual.

102.    Defendant's improper treatment of Plaintiff constitutes illegal harassment and disparate treatment based on Plaintiff's sexual orientation.

103.    The harassment constituted a hostile work environment because it was severe and pervasive enough to affect a term, condition, or privilege of employment.

104.    As a direct and proximate result of the harassment and disparate treatment, Plaintiff has suffered actual damages and is likely to be substantially and irreparably harmed in the loss of his employment prospects and reputation, so that he is entitled to a damages award in an amount to be determined at trial.

105.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

106.    As a result of Defendant's willful and malicious conduct, Plaintiff is also entitled to punitive damages.

## THIRD CAUSE OF ACTION

**Employment Discrimination Based on Race in Violation of Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981**

107.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

108.    Discrimination because of an employee's race is unlawful under 42 U.S.C. § 1981.

109.    Plaintiff is a member of a protected class based on his German race, ancestry, and ethnicity.

110.    Defendants were aware of Plaintiff's German race, ancestry, and ethnicity during the relevant time.

111.    While Plaintiff was employed by Defendants, Defendant's communications and actions against Plaintiff were abusive, intimidating, offensive, and humiliating, and they negatively impacted Plaintiff's terms, conditions, and privileges of employment, culminating in Defendants' unlawful termination of Plaintiff's employment in late November 2020.

112.    Shortly after Defendants terminated Plaintiff, Defendant disparaged Plaintiff for his race, ancestry, and ethnicity to Plaintiff's business contacts and acquaintances, including but not limited to Ms. Richter.

113.    Defendant's statements evidence that his abusive communications and actions against Plaintiff were motivated by discriminatory animus based on Plaintiff's race.

114.    Plaintiff was subjected by the above-described actions to unwelcome harassment and disparate treatment based on his race, treatment inferior to his non-German colleagues.

115.    Defendant's improper treatment of Plaintiff constitutes illegal harassment and disparate treatment based on Plaintiff's race.

116.    The harassment constitutes a hostile work environment because it was severe and pervasive enough to affect a term, condition, or privilege of employment.

117.    As a direct and proximate result of the harassment and disparate treatment, Plaintiff has suffered actual damages and is likely to be substantially and irreparably harmed in the loss of his employment prospects and reputation, so that he is entitled to a damages award in an amount to be determined at trial.

118.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

119.    As a result of Defendant's willful and malicious conduct, Plaintiff is also entitled to punitive damages.

## FOURTH CAUSE OF ACTION

**Employment Discrimination Based on Race in Violation of the D.C. Human Rights Act, D.C. Code § 2–1402.11 *et seq.***

120.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

121.    Plaintiff was an employee of Defendants within the meaning of D.C. Code § 2-1401.02(9).

122.    Defendants are employers within the meaning of D.C. Code § 2-1401.02(10).

123.    Discrimination because of an employee's race is unlawful under the D.C. Human Rights Act. *See* D.C. Code § 2–1402.11 *et seq.*

124.    Plaintiff is a member of a protected class based on his German race, ancestry, and ethnicity.

125.    Defendants were aware of Plaintiff's German race, ancestry, and ethnicity during the relevant time.

126.    While Plaintiff was employed by Defendants, Defendant's communications and actions against Plaintiff were abusive, intimidating, offensive, and humiliating, and they negatively impacted Plaintiff's terms, conditions, and privileges of employment, culminating in Defendants' unlawful termination of Plaintiff's employment in late November 2020.

127.     Shortly after Defendants terminated Plaintiff, Defendant disparaged Plaintiff for his race, ancestry, and ethnicity to Plaintiff's business contacts and acquaintances, including but not limited to Ms. Richter.

128.     Defendant's statements evidence that his abusive communications and actions against Plaintiff were motivated by discriminatory animus based on Plaintiff's race.

129.     Plaintiff was subjected by the above-described actions to unwelcome harassment and disparate treatment based on his race, treatment that was inferior to his colleagues who were not German.

130.     Defendant's improper treatment of Plaintiff constitutes illegal harassment and disparate treatment based on Plaintiff's race.

131.     The harassment constitutes a hostile work environment because it was severe and pervasive enough to affect a term, condition, or privilege of employment.

132.     As a direct and proximate result of the harassment and disparate treatment, Plaintiff has suffered actual damages and is likely to be substantially and irreparably harmed in the loss of his employment prospects and reputation, so that he is entitled to a damages award in an amount to be determined at trial.

133.     As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

134.     As a result of Defendant's willful and malicious conduct, Plaintiff is also entitled to punitive damages.

## FIFTH CAUSE OF ACTION

**Employment Discrimination Based on National Origin in Violation of the D.C. Human Rights Act, D.C. Code § 2–1402.11 *et seq.***

135.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

136.    Plaintiff was an employee of Defendants within the meaning of D.C. Code § 2-1401.02(9).

137.    Defendants are employers within the meaning of D.C. Code § 2-1401.02(10).

138.    Discrimination because of an employee's national origin is unlawful under the D.C. Human Rights Act. *See* D.C. Code § 2–1402.11 *et seq*.

139.    Plaintiff is a member of a protected class based on his German nationality.

140.    Defendants were aware of Plaintiff's German nationality during the relevant time.

141.    While Plaintiff was employed by Defendants, Defendant's communications and actions against Plaintiff were abusive, intimidating, offensive, and humiliating, and they negatively impacted Plaintiff's terms, conditions, and privileges of employment, culminating in Defendants' unlawful termination of Plaintiff's employment in late November 2020.

142.    Shortly after Defendants terminated Plaintiff, Defendant disparaged Plaintiff for his German nationality to Plaintiff's business contacts and acquaintances, including but not limited to Ms. Richter.

143.    Defendant's statements evidence that his abusive communications and actions against Plaintiff were motivated by discriminatory animus based on Plaintiff's national origin.

144.    Plaintiff was subjected by the above-described actions to unwelcome harassment and disparate treatment based on his national origin, treatment that was inferior to his colleagues who were not German.

145.    Defendant's improper treatment of Plaintiff constitutes illegal harassment and disparate treatment based on Plaintiff's national origin.

146.    The harassment constitutes a hostile work environment because it was severe and pervasive enough to affect a term, condition, or privilege of employment.

147.    As a direct and proximate result of the harassment and disparate treatment, Plaintiff has suffered actual damages and is likely to be substantially and irreparably harmed in the loss of his employment prospects and reputation, so that he is entitled to a damages award in an amount to be determined at trial.

148.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

149.    As a result of Defendant's willful and malicious conduct, Plaintiff is also entitled to punitive damages.

## SIXTH CAUSE OF ACTION
### Tortious Interference with Business Relationships

150.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

151.    Plaintiff had existing or prospective business relationships or expectancies with business associates with which Defendant intentionally interfered, causing Plaintiff immediate damage and future damage.

152.    Defendant made it his clear intention to ruin Plaintiff's business relationships or expectancies with business associates, including but not limited to Mr. Scott, Mr. Braun, Mr. Güllner, Mr. Schmid, Ms. Ahonen, Mr. Diehl, Mr. Obermeyer, and Mr. Eder, and the relevant actions were undertaken to inflict severe economic damage upon Plaintiff with respect to Plaintiff's current and future business ventures.

153.    Plaintiff had a current or future business relationship or expectancy with third parties to whom Defendant sent numerous degrading and career-damaging communications concerning Plaintiff.

154.    These third parties include, but are not limited to, Mr. Scott, Mr. Braun, Mr. Güllner, Mr. Schmid, Ms. Ahonen, and numerous viewers of Defendant's company's Twitter account.

155.    The information that Defendant sent to the above current or prospective business contacts contained false and misleading statements.

156.    Defendant knew of the current or prospective business relationship between Plaintiff and the aforementioned third parties.

157.    Defendant, through his conduct described above, interfered with those business relationships.

158.    Defendant acted with the purpose of causing irreparable damage to those current or prospective business relationships or expectancies.

159.    As a direct and proximate result of these actions, Plaintiff has suffered actual damages and is likely to be substantially and irreparably harmed in the loss of his employment prospects and reputation, and is entitled to a damages award in an amount to be determined at trial.

160.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

161.    As a result of Defendant's extreme, malicious conduct, Plaintiff is also entitled to punitive damages.

## SEVENTH CAUSE OF ACTION
### Fraudulent Misrepresentation

162.    Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

163.    By his words and conduct, knowing that Plaintiff would rely thereon, Defendant made false representations about foundational terms of their employment agreement, including paying Plaintiff a hiring bonus, timely compensating Plaintiff for services rendered, giving Plaintiff equity in the company, and opening a subsidiary company in Berlin and incorporating it prior to Plaintiff's start date specifically to accommodate Plaintiff's employment in Germany.

164.    At the time he made the misrepresentations, Defendant knew that they were false, and he did not intend to carry out the actions underlying the misrepresentations.

165.    Defendant made his misrepresentations for the purpose, or with the intent, of having them repeated, or their substance communicated to Plaintiff. Defendant further knew and wanted Plaintiff to rely upon Defendant's representations and to leave his high-paying job with EEAS.

166.    The foregoing facts alleged herein demonstrate conscious misbehavior or recklessness on the part of Defendant.

167.    Plaintiff was unaware of the falsity of Defendant's representations. Plaintiff reasonably relied upon Defendant's false representations. Had Plaintiff known that Defendant had

no intention of carrying out the actions underlying his misrepresentations, Plaintiff would never have worked for Defendants.

168.     As a proximate result of the knowing misrepresentations of Defendant, Plaintiff has been damaged in an amount to be established at trial.

169.     As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

170.     As a result of Defendant's extreme, malicious conduct, Plaintiff is also entitled to punitive damages.

## EIGHTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

171.     Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

172.     Defendant's actions as complained of, including publicly and privately harassing Plaintiff and continuously threatening him and his mother, constitute "extreme and outrageous conduct."

173.     Defendant's actions as complained of were clearly intended to cause Plaintiff severe emotional distress.

174.     Defendant's actions as complained of did indeed cause Plaintiff severe, verified emotional distress.

175.     Defendant's actions as complained of were the direct cause of Plaintiff's severe emotional distress.

176.     Defendant's actions as complained of constitute the tort of intentional infliction of emotional distress. Defendant's actions were willful and malicious.

177. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

178. As a result of Defendant's extreme, malicious conduct, Plaintiff is also entitled to punitive damages.

## NINTH CAUSE OF ACTION
### Breach of Contract

179. Plaintiff hereby repeats, re-alleges, and incorporates each and every allegation contained in the above paragraphs of this Complaint as though fully set forth in this paragraph of the Complaint.

180. Plaintiff and Defendants had an agreement by which Plaintiff agreed to perform services in exchange for Defendants' promise to pay Plaintiff a hiring bonus, to timely compensate Plaintiff for services rendered, to give Plaintiff equity in the company, to open a subsidiary company in Berlin to accommodate Plaintiff during his employment, and to incorporate the subsidiary before the start date of Plaintiff's employment with Defendants.

181. Plaintiff has fully performed the agreement by competently performing the services contemplated under the employment agreement with Defendants.

182. Defendants failed to pay Plaintiff a hiring bonus, failed at times to timely compensate Plaintiff for the services he rendered to Defendants, failed to give Plaintiff equity in the company, and failed to open a subsidiary in Berlin during Plaintiff's employment with Defendants or to incorporate the subsidiary before the start of Plaintiff's employment with Defendants. Defendants have thus materially breached their contractual obligations to Plaintiff.

183. Plaintiff has been damaged by Defendants' breach by committing his resources to perform services for which he did not always receive timely compensation—to the point that

Plaintiff could at times not afford to pay his rent and health insurance. Plaintiff has also been damaged by being induced by Defendants to leave his prior high-paying job at EEAS.

184.    Based upon Defendants' breach and the resulting damage, Plaintiff seeks payment of the unpaid hiring bonus, compensation for the financial damage caused by Defendants' failure to timely compensate Plaintiff for services rendered, payment equivalent to the equity in the company that Defendant promised to give to Plaintiff, and payment for the commensurate value of Defendants' unfulfilled promises to open and timely incorporate a Berlin, Germany, subsidiary to accommodate Plaintiff's employment, plus interest and the costs and disbursements of bringing this action.

185.    As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer mental anguish, emotional distress, and loss of enjoyment of life.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants, jointly and severally, awarding Plaintiff compensation and other damages in the form of back pay, front pay, and other monies and benefits unlawfully denied to Plaintiff, as well as separate damages for emotional distress, permanent damage to Plaintiff's emotional and mental wellbeing, loss of enjoyment of life, pain and suffering, shame and humiliation, punitive damages, and attorney's fees and costs, all of which includes the following specified forms of relief:

1.    On the First Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

2.      On the Second Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

3.      On the Third Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

4.      On the Fourth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

5.      On the Fifth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

6.      On the Sixth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

7.      On the Seventh Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined

at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

8.      On the Eighth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial, and at least Two Million Dollars ($2,000,000.00) in punitive damages, in an exact amount to be determined at trial;

9.      On the Ninth Cause of Action, judgment against Defendants for at least One Million Dollars ($1,000,000.00) in compensatory damages, in an exact amount to be determined at trial;

10.     An order enjoining Defendants to do all that is necessary in law or equity to make Plaintiff whole for the injuries and damages alleged herein; and

11.     All other relief permitted under the above Causes of Action, or which the Court deems just, proper, and equitable in the circumstances, together with interest on all Causes of Action, attorney's fees, costs, and other disbursements in this action.

Dated: March 7, 2022                     Respectfully submitted,

                                         */s/ J. Michael King*
                                         _____
                                         J. MICHAEL KING, ESQ.
                                         D.C. Bar No. 988456
                                         Law Offices of Peter C. Hansen, LLC
                                         1725 I Street, N.W., Suite 300
                                         Washington, D.C. 20006
                                         Ph: (202) 349-3907
                                         Fax: (202) 349-3915
                                         Email: mking@peterhansenlaw.com

                                         PETER C. HANSEN, ESQ.
                                         D.C. Bar No. 459982
                                         Law Offices of Peter C. Hansen, LLC
                                         1725 I Street, N.W., Suite 300
                                         Washington, D.C. 20006
                                         Ph: (202) 349-3780
                                         Fax: (202) 349-3915
                                         Email: phansen@peterhansenlaw.com

                                         *Attorneys for Plaintiff*