**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**FELIX KARTTE,**

> **Plaintiff,**

> **v.**

**TREVOR HUGH DAVIS, *et al.*,**

> **Defendants.**

---

**Civil Action No. 21-3310 (JEB)**

<u>**MEMORANDUM OPINION**</u>

While the COVID-19 pandemic has prodded companies all over the world to switch to remote work, this transition is not necessarily a panacea for employment disputes, as this case proves.  Plaintiff Felix Kartte, a Berlin resident, was hired by Defendants Trevor Hugh Davis and his D.C.-based security-consulting companies, CounterAction, LLC and ToSomeone, Inc., as their "Director of European Operation" in September 2020.  According to Kartte, promises of a hiring bonus, equity, and the creation of a German subsidiary never materialized; instead, Davis began subjecting him to abuse and disparagement, ultimately terminating him in late November of the same year.  Plaintiff's ensuing lawsuit alleges various torts, including defamation, fraud, and tortious interference with business relations, as well as discriminatory violations of the D.C. Human Rights Act and breach of contract.  In now moving to dismiss all nine counts, Defendants maintain that the operative Second Amended Complaint is replete with legal and factual deficiencies.  As half a loaf is better than none for both sides, the Court awards each a partial victory, granting the Motion as to some counts and denying it as to others.

I.      **Background**

The Court, as it must at this stage, draws the facts from the Second Amended Complaint, presuming them to be true.  See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Davis owns and operates both CounterAction and ToSomeone, which are located here in Washington and "provide consulting and other services with regard to, among other things, digital intelligence including threat assessments, risk management, and information operations."  ECF No. 9 (Second Amended Complaint), ¶ 13.  Davis and Kartte, who lives in Germany's capital, began speaking in May of 2020, and Plaintiff ultimately accepted a job with him that September.  Id., ¶¶ 14–15.  "Under the terms of this contractual employment relationship, Defendant hired Plaintiff for the position of 'Director of European Operation' of CounterAction, which Defendant characterized as a full-time, salaried senior-management-level position."  Id., ¶ 16.  Davis promised Kartte a hiring bonus and an annual $130,000 salary, as well as equity in the company to begin three months after his employment commenced.  Id., ¶¶ 17–18.  He also informed Plaintiff that he "planned to open a subsidiary company in Berlin, Germany, specifically to accommodate Plaintiff's employment."  Id., ¶ 19.

This transatlantic partnership had barely left the docks, however, when heavy weather set in: "[I]mmediately after Plaintiff's employment with Defendants began, Defendant started treating Plaintiff with extreme abusiveness and hostility on a regular, ongoing, and continuous basis."  Id., ¶ 23.  This devolved such that "[i]n or about the beginning of November 2020, Plaintiff began to receive text messages and emails from Defendant referring to Plaintiff as a 'dishonest evil bastard,' a 'sociopath,' and a 'parasite.'  Defendant repeatedly threatened to 'fire' Plaintiff for no evident reason."  Id., ¶ 28.  The next step was Davis's termination of Kartte in which he said, "You are fired, you dishonest evil bastard."  Id., ¶ 29.

This, unfortunately, does not represent the end of our voyage, as the acrimony only escalated.  Davis, for example, allegedly "threated Plaintiff to disclose his mother's address to the police" and to have Interpol or the FBI show up at his or his mother's house.  Id., ¶ 35.  He also warned Kartte that if he did not sign a non-disparagement agreement, he would contact Plaintiff's business associates and pass on derogatory information.  Id., ¶ 36.  No idle threat this: Davis did in fact convey false and misleading information about Kartte to "numerous individuals with whom Plaintiff has had professional connections."  Id., ¶ 37.  For example, in early December, he emailed one of Kartte's business contacts: "Felix stole our intellectual property and now he is extorting me."  Id., ¶ 38.  He also disclosed that Plaintiff is gay to "numerous, important business contacts" "in an effort to humiliate and embarrass Plaintiff."  Id., ¶ 39.  Davis also contacted two German journalists and "falsely told them that Plaintiff had extorted him, and falsely accused Plaintiff of having shared confidential information from his previous job with Defendant."  Id., ¶ 44.  Defendant additionally shared these characterizations in public tweets. Id., ¶¶ 50–51.  Finally, Kartte also alleges that Davis continued to threaten and harass him directly in the months after he left his employ.  Id., ¶¶ 61–66.

After two prior attempts, Plaintiff filed his Second Amended Complaint, which is the operative pleading here.  That document alleges nine separate counts: Defamation (Count I) for Davis's publishing on Twitter and to business associates statements regarding Plaintiff's alleged extortion and theft of trade secrets; DCHRA Violations (II, IV, V) for discrimination via both termination and a hostile work environment based on sexual orientation, race, and national origin; 42 U.S.C. § 1981 Violation (III) for race discrimination; Tortious Interference with Business Relations (VI) for telling business associates of Plaintiff's about his purported crimes; Fraudulent Misrepresentation (VII) in the enticing of Kartte to join Defendant's business;

Intentional Infliction of Emotional Distress (VIII) for the threatening and harassing messages;

and Breach of Contract (IX) for not delivering on promised features of Plaintiff's employment.

Defendants now move to dismiss all counts at least in part.

## II.     Legal Standard

In evaluating Defendants' Motions to Dismiss, the Court must "treat the complaint's

factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be

derived from the facts alleged.'"  Sparrow, 216 F.3d at 1113  (quoting Schuler v. United States,

617 F.2d 605, 608 (D.C. Cir. 1979)); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d

1249, 1253–54 (D.C. Cir. 2005).  The Court need not accept as true, however, "a legal

conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in

the Complaint.  See Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v.

Allain, 478 U.S. 265, 286 (1986)).

In general, a plaintiff bears the burden of proving that the Court has subject-matter

jurisdiction to hear her claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  It

is, however, "axiomatic that . . . courts may raise the issue *sua sponte*" even when the parties no

longer contest it.  See NetworkIP, LLC v. FCC, 548 F.3d 116, 120 (D.C. Cir. 2008) (quoting

Athens Cmty. Hosp., Inc. v. Schweiker, 686 F.2d 989, 992 (D.C. Cir. 1982)).  Indeed, a court has

an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional

authority," Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C.

2001), and "no action of the parties can confer subject-matter jurisdiction" upon it where such

jurisdiction does not exist.  See NetworkIP, 548 F.3d at 120 (quoting Akinseye v. District of

Columbia, 339 F.3d 970, 971 (D.C. Cir. 2003)).  A plaintiff's factual allegations will thus "bear

closer scrutiny" in resolving jurisdictional issues than in resolving a motion for failure to state a

claim.  Grand Lodge of Fraternal Order of Police, 185 F. Supp. 2d at 13–14 (quoting 5A Charles

A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987)).

A Rule 12(b)(6) motion, in contrast, seeks the dismissal of an action where a complaint

fails "to state a claim upon which relief can be granted."  Although "detailed factual allegations"

are not necessary to withstand a motion to dismiss for failure to state a claim, "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted).  For a complaint

to survive a 12(b)(6) motion, the facts alleged in the complaint "must be enough to raise a right

to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).

## III.    Analysis

As Defendants move to dismiss all of the counts at least in part, the Court proceeds

through them in the following order: Defamation (I), DCHRA (II, IV, and V), Tortious

Interference with Business Relationships (VI), Fraudulent Misrepresentation (VII), IIED (VIII),

and Breach of Contract (IX).  Plaintiff concedes that Count III, brought under 42 U.S.C. § 1981,

should be dismissed, so the Court will spill no ink on that cause of action.  See ECF No. 15

(Opposition) at 15.

One threshold matter deserves attention, as it affects many of the counts.  As part of his

Opposition, Kartte attaches no fewer than 100 exhibits, many of which he then cites in support of

his various arguments.  See ECF No. 16 (Exhs.); see also, e.g., Opp. at 9, 12, 17, 19, 21.  While

record evidence would certainly be appropriate (and essential) at summary judgment, the Court

at this stage considers only the allegations in the operative Complaint.  The only relevant

exception here, as noted below, concerns subject-matter jurisdiction, on which issue the Court

may look beyond the four corners of the Complaint.  See Jerome Stevens Pharms., Inc., 402 F.3d

at 1253 (court may consider materials outside pleadings on 12(b)(1) motion).  As a result, in its

ensuing Rule 12(b)(6) discussion, the Court will ignore the aforementioned exhibits.

    A.  <u>Defamation</u>

    The first and most involved cause of action in the Second Amended Complaint is for

defamation.  <u>See</u> SAC, ¶¶ 71–90.  Although the language of the count itself incorporates the

allegations detailed in the factual section of the pleading, it does not specifically itemize what

statements underlie this claim beyond saying that "Plaintiff was the subject of Defendant's

Twitter posts, conversations, text messages, and emails directed to or involving third parties,"

and that the statements "alleg[ed] criminal and unethical conduct by Plaintiff."  <u>Id.</u>, ¶¶ 72, 74.

Paging back to the incorporated allegations, then, the Court finds at least a few specific incidents

of allegedly false and defamatory statements that Davis made to others.

    To start, Kartte alleges that "in or about December 2, 2020, Defendant wrote, 'Felix stole

our intellectual property and now he is extorting me.'  Defendant sent this message to Mr.

Gullner, a business contact of Plaintiff."  <u>Id.</u>, ¶ 38.  Similarly, he alleges that "Defendant

contacted Mr. Diehl and Bastian Obermayer, two well-known journalists, falsely told them that

Plaintiff had extorted him, and falsely accused Plaintiff of having shared confidential

information from his previous job with Defendant."  <u>Id.</u>, ¶ 44.  In another incident, Defendant

allegedly "in emails and public tweets dated December 2, 2020 and December 7, 2020, falsely

accused Plaintiff of criminal 'extortion' and fraudulent behavior."  <u>Id.</u>, ¶ 50.  Last, in a public

Twitter account, Davis allegedly wrote: "Regretfully, Felix Kartte was dismissed last week.

Rather than exiting with dignity, he has attempted to extort us, threatening to publish stolen data

that would impact the personal security of our clients."  <u>Id.</u>, ¶ 51.  While Plaintiff's factual

recitation details a number of other statements — some of which are mentioned only in cursory

fashion — and while Davis attempts to refute each of them, see ECF No. 17 (Reply) at 2–5, the Court believes that this parsing can be left to another day.  For now, it is more productive to assess whether a claim lies for the four statements just discussed.

As this Court has explained, "To state a claim for defamation under D.C. law — which Plaintiff does not contest applies in this diversity action — a plaintiff must show: '(1) that the defendant made a false and defamatory statement [about her]; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" McCaskill v. Gallaudet Univ., 36 F. Supp. 3d 145, 158 (D.D.C. 2014) (quoting Oparaugo v. Watts, 884 A.2d 63, 76 (D.C. 2005)).  In addition, a "false allegation of criminal wrongdoing is defamation per se."  Westfahl v. Dist. of Columbia, 75 F. Supp. 3d 365, 375 (D.D.C. 2014).

In moving to dismiss this count, Davis maintains that "each identified statement was substantially true, or a protected statement of opinion, and therefore is not defamatory as a matter of law."  MTD at 7.  While certain other statements — e.g., that Plaintiff had "negligible ethics," SAC, ¶ 48 — would likely be characterized as protected opinion, none of the statements recounted above falls into that category, leaving truth as Davis's main defense.  See, e.g., Moldea v. New York Times Co., 15 F.3d 1137, 1142 (D.C. Cir. 1994) ("truth is a complete defense to defamation").  In maintaining this position, Defendants cite a letter from Plaintiff's lawyer in which he demanded payment for Kartte and stated that he would take certain steps were such payment not made.  See MTD at 9.  As a result, Davis contends that his characterization of Kartte's conduct as extortion and theft of trade secrets was accurate.

There are several principal pitfalls associated with this line of attack.  First, to quote the lawyer's email is to rely on material outside the four corners of the Complaint.  Just as the Court has determined to ignore the exhibits that Plaintiff seeks to cite, it cannot take the contrary position as to Defendants' extra-record material.  Second, even if that email were part of the Complaint, it would be difficult for the Court to hold as a matter of law that it constitutes extortion or acknowledges theft of trade secrets, as opposed to constituting a lawful demand by counsel that states an opening negotiating position.  Third, Plaintiff has not conceded that Davis's defamatory statements all refer to the lawyer's email; instead, this would be something that Defendants would have to prove as part of an affirmative defense.

As Kartte has thus sufficiently alleged at least four false and defamatory statements, the Court will not dismiss Count I.  As to the other statements alluded to earlier, discovery will be the proper vehicle to explore their viability.

B.  DCHRA

 Counts II (sexual orientation), IV (race), and V (national origin) all invoke the DCHRA. As a preliminary issue, the Court is skeptical that Plaintiff is in a protected class as to race, as opposed to national origin, "based on his German race, ancestry, and ethnicity."  SAC, ¶ 124. Putting aside painful episodes from European history on this topic, it is not difficult in this case to make the distinction between his country of origin (Germany) and the race to which he belongs (White).  Compare Graetz v. Dist. of Columbia Public Schools, No. 86-293, 1987 WL 8527, at *1 (D.D.C. Mar. 3, 1987) ("Plaintiff Eric W. Graetz contends that he was not selected for two positions within the District of Columbia Public School system because of his race (white) and national origin (German) in violation of Title VII."); but cf. St. Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987) (§ 1981 covers those "subjected to intentional discrimination

solely because of their ancestry or ethnic characteristics").  Because the Court dismisses the counts on other grounds, it need not pursue this further.

The DCHRA makes it illegal to "discriminate against any individual, with respect to . . . compensation, terms, conditions, or privileges of employment, including promotion" and to "limit, segregate, or classify . . . employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or her status as an employee" on the basis of membership in a protected class.  See D.C. Code § 2-1402.11(a)(1). To adequately plead discriminatory treatment under the DCHRA, therefore, Plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  See Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002).

The Complaint is not entirely clear as to what adverse action(s) it is alleging.  While it plainly alleges at least a hostile work environment, the Court is not certain whether Kartte also wishes to allege any other adverse actions.  To give him the benefit of the doubt, however, it will assume that he also alleges a violation of the DCHRA via his termination.

In seeking dismissal of these three causes of action, Defendants argue first that no subject-matter jurisdiction exists for any firing-based claim because Davis was not in the District of Columbia at the time.  As to a hostile work environment, Defendants maintain that Kartte's allegations are insufficient on their face to carry the heavy burden that such a claim entails.

1.  *Subject-Matter Jurisdiction*

"If an employee is not employed in the District, '[e]ither the [adverse employment] decision must be made, or its effects must be felt, or both must have occurred, in the District of Columbia' for there to be jurisdiction under the DCHRA."  Cole v. Boeing Co., 845 F. Supp. 2d

277, 284 (D.D.C. 2012) (quoting <u>Monteilh v. AFSCME, AFL-CIO</u>, 982 A.2d 301, 305 (D.C. 2009)).  In other words, "[t]he DCHRA is not extraterritorial; it does not and cannot secure an end to discrimination in jurisdictions outside of the District of Columbia."  <u>Id.</u> (citations omitted).  Indeed, "the most important factor in determining whether a court has subject matter jurisdiction over a [DCHRA] claim is not whether the plaintiff was actually employed in the District of Columbia, but whether the alleged discriminatory acts occurred in the District."  <u>Miller v. Insulation Contractors, Inc.</u>, 608 F. Supp. 2d 97, 104 (D.D.C. 2009).

There is no question here that Plaintiff was never employed in our city, and Davis has provided evidence that he was in a different Columbia — the country (Colombia), not the <u>District</u> of Columbia — when he terminated him.  <u>See</u> MTD at 16; ECF No. 10-1 (Declaration of Trevor Davis), ¶ 12.  The best Kartte can offer in response is that Davis's declaration and rental-car invoice from the Bogota airport do "not constitute indisputable evidence to demonstrate that Davis was not located in the District of Columbia at the time of Plaintiff's termination."  Opp. at 11.  Defendants, however, are not required to offer proof beyond a reasonable doubt, and Davis's evidence is more than sufficient to show that no subject-matter jurisdiction exists for the firing claim.  <u>See</u> <u>Monteilh</u>, 982 A.2d at 304 (actual discriminatory decision by employer must have taken place in D.C. for jurisdiction to exist).

### 2.   *Hostile Work Environment*

Kartte also alleges that he was subject to a hostile work environment on the basis of his sexual orientation, race, and national origin.  "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  <u>Baloch v. Kempthorne</u>, 550 F.3d 1191, 1201 (D.C. Cir. 2008)

(citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).  "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'"  George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting Faragher, 524 U.S. at 788); see also Peters v. District of Columbia, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) ("To '[prevent] Title VII from expanding into a general civility code,' the Supreme Court has emphasized as 'crucial' the requirement that the behavior be 'so objectively offensive as to alter the conditions of the victim's employment.'") (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)).

To prevail on such a claim, a plaintiff must demonstrate that he was subjected to a series of adverse actions that are "'adequately linked' such that they form 'a coherent hostile environment claim.'"  Baird v. Gotbaum (Baird II), 792 F.3d 166, 168–69 (D.C. Cir. 2015) (quoting Baird v. Gotbaum (Baird I), 662 F.3d 1246, 1251 (D.C. Cir. 2011)).  "For example, they might 'involve the same type of employment actions, occur relatively frequently, and [be] perpetrated by the same managers.'"  Id. at 169 (quoting Baird I, 662 F.3d at 1251.  Even when a plaintiff has established conduct that meets this standard, he will succeed on claim only if he also "establish[es] a causal connection between the harassment and [his] protected [characteristics]."  Peters, 873 F. Supp. 2d at 189.

Here, Defendants note that Plaintiff has pled only three incidents.  First, when Davis missed meetings and Kartte asked why he had failed to appear, Davis told him that he "should go 'f—k' himself."  SAC, ¶ 24.  Second, Davis sent Kartte messages and emails calling him a "dishonest evil bastard," a "sociopath," and a "parasite."  Id., ¶ 28.  Last, he "repeatedly threatened to 'fire' Plaintiff for no evident reason, other than Plaintiff's refusal to speak on the phone with Defendant outside work hours, when Defendant was in a state of rage and outright

hostility, or when Plaintiff refused to collaborate with Defendant in challenging claims made against Defendant by [another employee]." Id.

Plaintiff also points to a summary allegation about Defendant's actions being "abusive, intimidating, offensive, and humiliating," Opp. at 12 (citing SAC, ¶¶ 97, 126, 141), but that provides no further factual support for his claim. See Walden v. Patient-Centered Outcomes Research Inst., 177 F. Supp. 3d 336, 345 (D.D.C. 2016) (finding hostile-environment allegations made in conclusory fashion insufficient to withstand motion to dismiss). Similarly, Kartte cites "Defendants' actions and communications after wrongfully terminating Plaintiff" as providing "additional insight into Defendants' motivating animus, biases, and prejudices." Opp. at 12. While these may indeed cast a light on the reasons behind Davis's actions, they do not weigh in on the question of whether his deeds were sufficiently severe.

Ultimately, Davis's statements and messages to Kartte, while undeniably unpleasant, do not rise to the level of a hostile work environment. Kartte, it bears repeating, was never in the D.C. office and thus never dealt with Davis in person. As a result, negative statements that would likely be more offensive to hear face to face were delivered via phone, email, or text. More importantly, courts must be careful to avoid becoming personnel administrators, monitoring and gauging day-to-day language in the workplace, especially communications that bear no indicia of discriminatory bias. The Court, consequently, cannot find that Plaintiff's claims clear the hostile-environment bar. See, e.g., Leavitt, 407 F.3d at 408, 416–17 (statements by three employees over six-month period that plaintiff should "go back where [she] came from," separate acts of yelling, and hostility did not rise to level of severity necessary to find hostile work environment); Badibanga v. Howard Univ. Hosp., 679 F. Supp. 2d 99, 103–04 (D.D.C. 2010) (dismissing hostile-work-environment claim where plaintiff was placed on

administrative leave due to false accusation, his accent was criticized, he was told he was easy to replace with an American, and he was told that his supervisor would not hire other Africans).

    C.  <u>Tortious Interference</u>

    Kartte's next count pleads that he "had existing or prospective business relationships or expectancies with which Defendant intentionally interfered, causing Plaintiff immediate damage and future damage." SAC, ¶ 151. More specifically, "Defendant made it his clear intention to ruin Plaintiff's business relationships or expectancies with business associates, including but not limited to [eight named individuals]," "to whom Defendant sent numerous degrading and career-damaging communications concerning Plaintiff." Id., ¶¶ 152, 153.

    Under D.C. law, the tort of "intentional interference with business relations[]" has the following elements: (1) the "existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." <u>Onyeoziri v. Spivok</u>, 44 A.3d 279, 286 (D.C. 2012) .

    In moving to dismiss, Davis contends that Kartte never alleges an actual business expectancy; in other words, simply identifying particular individuals is insufficient. <u>See</u> MTD at 21. It is true that Plaintiff must plead facts showing an expectancy that is "commercially reasonable to anticipate before its loss may be actionable." <u>Banneker Ventures, LLC v. Graham</u>, 798 F.3d 1119, 1134 (D.C. Cir. 2015) (internal quotation marks and citation omitted). He thus must allege that there was "a reasonable likelihood or probability that a contract would have resulted" from one of his contacts. <u>Williams v. Federal Nat'l Mortg. Ass'n</u>, 05-1483, 2006 WL 1774252, at *9 (D.D.C. June 26, 2006).

Plaintiff rejoins that his Complaint is "replete with references to Plaintiff's business associates and professional connections with whom he collaborated before, during, and after his employment by Defendants." Opp. at 15. He further contends that "[g]iven the exclusive, close-knit nature of the data-security professional community to which Plaintiff, Defendants, and the dozen or so individuals referenced in the SAC belong, . . . it is entirely commercially reasonable for Plaintiff to have anticipated and gravely feared that Defendants' targeted communications to such individuals would impede his future employment, contractor, or consultant opportunities with the organizations and individuals." Id. at 17.

Although the Court has some sympathy with Defendants' position that Plaintiff's arguments are either too speculative or too conclusory, caselaw from the District of Columbia Court of Appeals is to the contrary. In Close It! Title Services, Inc. v. Nadel, 248 A.3d 132 (D.C. 2021), for example, that court reversed the dismissal of a claim for tortious interference with business relations. The plaintiffs there had alleged that "'[o]ver the past twenty years, [they] have established valid contractual and business relationships with lenders, insurers, real estate brokers and homebuyers and sellers.'" Id. at 141 (alterations in original). "This allegation," the court found, "is sufficient to satisfy the first element of the tort: the existence of a 'valid business relationship.'" Id. It added that "it has long been established that plaintiffs need not identify specific business relationships or otherwise plead with particularity." Id. (footnote omitted); see also Havilah Real Prop. Servs., LLC v. VLK, LLC, 108 A.3d 334, 351 (D.C. 2015) (rejecting defendant's argument that plaintiff failed to identify specific business relationships).

Under this rather liberal standard, the Court is constrained to conclude that Kartte's allegations regarding his business relationships, particularly given that he has listed actual individuals by name, suffices to state a claim at this stage.

D.  Fraudulent Misrepresentation

Next up is Defendants' position that Plaintiff's fraudulent-misrepresentation count should be dismissed as duplicative of his one for breach of contract.  See MTD at 24 (citing, *e.g.*, Plesha v. Ferguson, 725 F. Supp. 2d 106, 113 (D.D.C. 2010) (D.C. law "requires that the factual basis for a fraud claim be separate from any breach of contract claim that may be asserted.")).  Put another way, "conduct occurring during the course of a contract dispute may be the subject of a fraudulent or negligent misrepresentation claim when there are facts separable from the terms of the contract upon which the tort may independently rest and when there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would reach none of the damages suffered by the tort."  Choharis v. State Farm Fire & Cas. Co., 961 A.2d 1080, 1089 (D.C. 2008).

Defendants are correct that the alleged misrepresentations closely mirror the alleged contract breaches.  Compare SAC, ¶ 163 (Fraudulent Misrepresentation) ("Defendant made false representations about foundational terms of their employment agreement, including paying Plaintiff a hiring bonus, timely compensating Plaintiff for services rendered, giving Plaintiff equity in the company, and opening a subsidiary company in Berlin and incorporating it prior to Plaintiff's start date specifically to accommodate Plaintiff's employment in Germany.") with id., ¶ 180 (Breach of Contract) ("Plaintiff and Defendants had an agreement by which Plaintiff agreed to perform services in exchange for Defendants' promise to pay Plaintiff a hiring bonus, to timely compensate Plaintiff for services rendered, to give Plaintiff equity in the company, to open a subsidiary company in Berlin to accommodate Plaintiff during his employment, and to incorporate the subsidiary before the start date of Plaintiff's employment with Defendants.").

Kartte attempts to resuscitate his misrepresentations count with some sweeping, yet unsubstantiated, assertions.  He contends that his "fraud claim (Count VII) does not entirely duplicate his breach of contract claim (Count IX)" and that "the claims are fundamentally different[] and are not mutually exclusive under the particular circumstances of this case."  Opp. at 18, 21.  Of course, Plaintiff is free to characterize the claims in whatever way he wishes, but the Court must confine its analysis to the respective language of the allegations.  Finding them to be essentially identical, it determines that the fraud cause of action cannot survive.  See, e.g., Plesha, 725 F. Supp. 2d at 113 ("Plesha's fraud claim arises out of the same alleged conduct by Defendants — late payments and promises to pay — that provides the basis for his breach of contract claim.  Therefore, his fraud claim cannot stand independent of his breach of contract claim.").

E.  IIED

In his eighth count for Intentional Infliction of Emotional Distress, Kartte alleges that "Defendant's actions as complained of, including publicly and privately harassing Plaintiff and continuously threatening him and his mother, constitute 'extreme and outrageous conduct."  SAC, ¶ 172.  "To prevail on an IIED claim, he must prove: (1) extreme and outrageous conduct that (2) intentionally or recklessly (3) caused him to suffer severe emotional distress."  Cooper v. Dist. of Columbia, 548 F. Supp. 3d 170, 183 (D.D.C. 2021) (citing Duncan v. Children's Nat'l Med. Ctr., 702 A.2d 207, 211 (D.C. 1997)).  "The alleged conduct must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community.'"  Id. at 183-184 (quoting District of Columbia v. Tulin, 994 A.2d 788, 800 (D.C. 2010) (citation omitted)).  In assessing the conduct, courts consider "the nature of the activity at issue[,] . . . the relationship between the parties, and the

particular environment in which the conduct took place." Ortberg v. Goldman Sachs Grp., 64

A.3d 158, 163 (D.C. 2013) (internal citation omitted).

Defendants contend that the incidents that Kartte alleges do not cross this demanding

threshold.  For example, none of the insults or threats occurred in person; rather, almost all

occurred via email and text, with some over the phone.  The threats, moreover, do not encompass

any physical violence or danger.  Unfortunately for Kartte, "[m]ere insults, indignities, threats,"

and similar conduct "are not sufficient" to establish an IIED claim, the standard for which is

"exceptionally demanding." Bonner v. S-Fer Int'l, Inc., 207 F. Supp. 3d 19, 25 (D.D.C. 2016).

In addition, the fact that these incidents occurred in the workplace also weakens Plaintiff's case,

as this Court previously explained:

> [The IIED] standard does not become more relaxed merely because
> Defendants were Plaintiffs' employers.  Indeed, if anything, a
> plaintiff faces an even higher bar when suing his employer.  See,
> e.g., Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628
> (D.C. 1997) ("In the employment context, we traditionally have
> been demanding in the proof required to support an intentional
> infliction of emotional distress claim.").  Liability does not extend
> to "mere insults, indignities, threats, annoyances, petty oppressions,
> or other trivialities." Waldon v. Covington, 415 A.2d 1070, 1076
> (D.C. 1980) (quoting Restatement (Second) of Torts § 46 (1965)).

Asare v. LM-DC Hotel, LLC, 62 F. Supp. 3d 30, 35–36 (D.D.C. 2014).

In response, Kartte's Opposition on this count cites no cases that do anything more than

articulate the standard, and his reliance on his exhibits is, as discussed above, improper at the

motion-to-dismiss stage.  See Opp. at 21–22.  As a result, he cannot surmount the high bar that

an IIED claim imposes, and this count will be dismissed.

F.   Breach of Contract

Defendants' last position is that Count IX for breach of contract cannot stand against

Davis individually, as he was not a contracting party.  See MTD at 31–32.  In other words, since

Davis acted as the chief executive of CounterAction, whom Kartte alleges was his employer, and since he "pleads no facts to show that Davis contracted with Plaintiff in his individual capacity or is liable on Counteraction's alleged employment contract with Plaintiff, this claim must be dismissed against Davis." Id.

The Complaint is rather opaque on this point; in fact, it refers in this count only to the plural "Defendants" as having made promises and then having breached them. See SAC, ¶¶ 180–85. Yet there are a number of other allegations sprinkled throughout that pleading that appear to refer to contractual terms between Kartte and Davis himself. For example: "Defendant [Davis] began a series of communications, negotiations, and interviews with Plaintiff that led to Plaintiff ultimately contracting employment with Defendant in or about the beginning of September 2020." SAC, ¶ 15. Or: "Defendant's [Davis's] and Plaintiff's employment contract included Defendant's promise that this new company would be incorporated prior to Plaintiff's start date." Id., ¶ 20. While imprecision in pleading should not provide cover, the Court cannot say as a matter of law that the Complaint insufficiently alleges that Davis himself entered any agreement with Kartte. This count, consequently, will stand against all Defendants.

IV.     **Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Defendant's Partial Motion to Dismiss. Counts I, VI, and IX may proceed. A separate Order consistent with this Opinion will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: May 6, 2022